UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

SHEILA GILMOUR o/b/o THEODORE
WINTER, II,[1]

                                        Plaintiff,

v.                                                          6:02-CV-0960
                                                            (LEK/GHL)

COMMISSIONER OF SOCIAL SECURITY,
                                        Defendant.

APPEARANCES:                                    OF COUNSEL:

ERWIN, MCCANE & DALY                            THOMAS C. ERWIN, ESQ.
*Counsel for Plaintiff*
23 Elk Street
Albany, New York 12207

HON. GLENN T. SUDDABY                           WILLIAM H. PEASE, ESQ.
United States Attorney for the                  Assistant United States Attorney
 Northern District of New York
*Counsel for Defendant*
P.O. Box 7198
100 S. Clinton Street
Syracuse, New York 13261-7198

GEORGE H. LOWE, United States Magistrate Judge

## REPORT AND RECOMMENDATION[2]

## I.      BACKGROUND

### A.      Procedural History

Plaintiff filed an application for disability insurance benefits ("DIB") on July 25, 2000.

---

[1]  Martin Winter, the father of Theodore Winter, II, was the original Plaintiff in this action. Upon Martin Winter's death, Theodore Winter, II, as represented by his mother, Sheila Gilmour, was substituted as Plaintiff.  (Dkt. No. 17.)  Any references to "Plaintiff" or "Claimant" in this Report and Recommendation refer to Martin Winter, the original Plaintiff.

[2]  This matter was referred to me for report and recommendation by the Honorable Lawrence E. Kahn, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Northern District of New York Local Rule 72.3.

(Administrative Transcript ("T") at 84-87, 94.)  The application was denied initially and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") which was held on August 21, 2001.  (T. at 47-65.)  On October 24, 2001, the ALJ issued a decision finding that Plaintiff was not disabled.  (T. at 15-20.)

Plaintiff appealed to the Appeals Council, and the ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on June 18, 2002.  (T. at 6-7.)  Plaintiff commenced this action on July 24, 2002.  (Dkt. No. 1.)

**B.     The Contentions**

Plaintiff makes the following claims:

(1)     Whether the ALJ committed reversible error by failing to make a determination as to whether the Plaintiff's migraine headaches constitute a severe impairment.  (Dkt. No. 19 at 11-12.)

(2)     Whether the ALJ's finding that the Plaintiff's dysthymic disorder was not a severe impairment is supported by substantial evidence in the record.  (Dkt. No. 19 at 12.)

(3)     Whether the ALJ failed to meet his burden of fully and fairly developing the record with regard to all of the Plaintiff's exertional and non-exertional impairments.  (Dkt. No. 19 at 13-14.)

(4)     Whether the ALJ failed to properly evaluate the Plaintiff's credibility with regard to his complaints of subjective pain and disabling symptoms in light of the objective evidence of his degenerative joint disease.  (Dkt. No. 19 at 15-17.)

Defendant contends that the ALJ's decision is supported by substantial evidence and thus should be affirmed.  Dkt. No. 20.

2

## II.    APPLICABLE LAW

### A.    Standard for Benefits

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A) (2004).[3]  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B) (2004).

Acting pursuant to its statutory rulemaking authority (42 U.S.C. §§ 405(a), 1383(d)(1)), the Social Security Administration ("SSA") has promulgated regulations establishing a five-step sequential evaluation process to determine disability.  20 C.F.R. § 404.1520 (2005).  "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further." *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).

> At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity."  [20 C.F.R.] §§ 404.1520(b), 416.920(b).  At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or

---

[3]  As of September 25, 2003, revisions were made to certain sections of the Code of Federal Regulations; the revisions, however, have no effect on the outcome of this Report and Recommendation.

combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." [20 C.F.R.] §§ 404.1520(c), 416.920(c).  At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  [20 C.F.R. §§] 404.1520(d), 416.920(d).  If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.[]  If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.[]  [20 C.F.R.] §§ 404.1520(f), 404.1560(c), 416.920(f), 416.9630(c).

*Barnhart v. Thomas*, 540 U.S. at 24-25 (footnotes omitted).

The plaintiff-claimant bears the burden of proof regarding the first four steps.  *Serrano v. Barnhart*, Civ. No. 02-6372, 2003 WL 22683342, at *11 (S.D.N.Y. Nov. 14, 2003).  If the plaintiff-claimant meets his or her burden of proof on all four steps, the burden then shifts to the defendant-Commissioner to prove that the plaintiff-claimant is capable of performing other jobs which exist in significant numbers in the national economy.  *Id.* (citing *Barnhart v. Thomas*, 540 U.S. at 25; other citations omitted).

**B.    Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  *Brown v. Barnhart*, Civ. No. 02-4523, 2003 WL 1888727, at *4 (S.D.N.Y. Apr. 15, 2003); *Serrano v. Barnhart*, 2003 WL 22683342, at *10; *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing

4

court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision.  42 U.S.C. § 405(g) (2005); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).  "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Serrano*, 2003 WL 22683342, at *10; *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258.  However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972); *see also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## III.    THE PLAINTIFF

Plaintiff was born on January 22, 1954.  (T. at 84.)  He obtained a Master's Degree in

Humanities and previously worked as a telemarketer, courier, temporary office support staff,

security guard, auto salesperson, and delivery person.  (T. at 50-52, 100.)  Plaintiff alleges

disability due to, *inter alia*, pain in his neck and back, migraine headaches, and depression.  (Dkt.

No. 19 at 3.)

## IV.      THE ALJ'S DECISION

The ALJ found that: (1) Plaintiff had not engaged in any substantial gainful activity (T. at

19); (2) Plaintiff had "severe cervical and lumbar strain/sprain, mild carpal tunnel syndrome,

obesity, and mild dysthymia," but that none, singly or in combination, met or equaled a listed

impairment (*Id.*); and (3) Plaintiff could perform his past relevant work and thus was not disabled

(*Id.*).

## V.       DISCUSSION

### A.     Whether the ALJ Committed Reversible Error by Failing to Make a Determination as to Whether the Plaintiff's Migraine Headaches Constitute a Severe Impairment

Plaintiff argues that his migraine headaches were a severe impairment and caused

significant non-exertional limitations that would affect his ability to perform any substantial

gainful activity on a regular and consistent basis.  (Dkt. No. 19 at 11-12.)  Plaintiff further

contends that the ALJ's failure to consider the "relevant evidence of the plaintiff's disabling

migraine headaches" is reversible error.  (Dkt. No. 19 at 12.)  Defendant argues that the ALJ

properly found that Plaintiff's migraine headaches were not severe and caused no functional

limitations because the headaches were well-controlled with medication and because no doctor

6

noted any functional limitations imposed by Plaintiff's migraine headaches.[4]  (Dkt. No. 20 at 6-7.)

Because Plaintiff's argument on this point is so conclusory,[5] the Court must try to interpret what he is arguing.  The Court's best interpretation is that Plaintiff is arguing that the ALJ should have considered the "history of severe, frequent migraine headaches," in combination with his other impairments in order to evaluate whether the impairments, including the migraine headaches, would affect his ability to perform work.

In his decision, the ALJ found that Plaintiff's impairments, in combination, were severe.[6] Specifically, the ALJ found that Plaintiff had "severe cervical and lumbar strain/sprain, mild carpal tunnel syndrome, obesity, and mild dysthymia."  (T. at 18, 19.)  Absent is any explicit finding regarding Plaintiff's migraine headaches.

The ALJ clearly was aware of Plaintiff's migraine headaches, as he referenced them in his

---

[4]  In her brief, Defendant states that "the ALJ correctly concluded that Mr. Winter's migraine headaches . . . did not cause more than minimal restrictions on his ability to perform work-related mental and physical activities."  (Dkt. No. 20 at 6.)  Defendant does not provide a specific citation to the ALJ's decision where he made such a statement.  In fact, in reviewing the ALJ's decision, this Court has not found any specific finding by the ALJ regarding Plaintiff's migraine headaches.  The ALJ referenced Plaintiff's migraine headaches when he reviewed the medical evidence (T. at 16, 18), however, he made no specific finding as to whether Plaintiff's migraine headaches did or "did not cause more than minimal restrictions on his ability to perform work-related mental and physical activities."

[5]  Plaintiff's argument on this point consists of three sentences and contains no citations to record evidence, caselaw, or statutory authority.

[6]  A "severe impairment" is defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c), 404.1521 (2005).  "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1521(b) (2005).  This includes walking; standing; sitting; lifting; pushing; pulling; reaching; carrying; handling; seeing; hearing; speaking; understanding, carrying out, remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting.  20 C.F.R. § 404.1521(b) (2005).  *See also Ianni v. Barnhart*, 403 F. Supp. 2d 239, 252 (W.D.N.Y. 2005) and *Camacho v. Apfel*, Civ. No. 97-6151, 1998 WL 813409, at *6 (E.D.N.Y. July 22, 1998).

discussion of the medical evidence (T. at 16, 18), however what is unclear is why the ALJ did not make any specific finding regarding these headaches.  It is possible that this omission was an oversight on the part of the ALJ; it is also possible that the ALJ found that the migraine headaches did not meet the requirements of a disability (as defined in 20 C.F.R. § 404.1505(a) (2005)).  However, absent an explicit finding by the ALJ, this Court cannot make any assumptions.  *See Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir. 1974) ("It is incumbent upon the examiner to make specific findings – the court may not speculate as to his findings.") (citing *Williams v. Celebrezze*, 359 F.2d 950 (4th Cir. 1966)).  Without an explicit finding, it is unclear whether the ALJ considered Plaintiff's migraine headaches, in combination with his other impairments, in order to determine whether they imposed any limitations on Plaintiff's ability to perform substantial gainful activity.

Accordingly, remand is necessary because the Court cannot determine whether the ALJ's finding that Plaintiff could perform his past relevant work is supported by substantial evidence since there is no finding with regard to Plaintiff's migraine headaches.

**B.      Whether the ALJ's Finding That the Plaintiff's Dysthymic Disorder Was Not a Severe Impairment Is Supported by Substantial Evidence in the Record**

Plaintiff argues that his depressive syndrome "fall[s] within the criteria set forth in Section 12.04, and require[s] a finding that [his] Major Depression was a severe impairment." (Dkt. No. 19 at 12.)  Because Plaintiff's brief does not elaborate much further on this, and because Plaintiff's point heading for this section only mentions severity and not Section 12.04, it is somewhat unclear what Plaintiff is arguing.  The Court presumes that Plaintiff is arguing that the ALJ erred in finding that Plaintiff suffered from mild, not severe, dysthymia and he erred in

8

not finding that Plaintiff's dysthymia met or equaled[7] Section 12.04 of the Listing of Impairments ("Listing 12.04").

At the outset, the Court notes that at step two of the five step process, the medical severity of the claimant's impairment(s) is considered.  20 C.F.R. § 404.1520(a)(4)(ii) (2005).  "If you do not have a severe medically determinable physical or mental requirement that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled."  *Id.*  Pursuant to the third step of the five step process, if the claimant has an "impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled."  20 C.F.R. § 404.1520(a)(4)(iii) (2005).

In his opinion, the ALJ summarized the medical evidence regarding Plaintiff's depression, and stated:

> In determining whether or not the claimant's dysthymic disorder is severe, it is necessary to use the two-part analysis set forth in Section 12.04 of the Regulations.  Based on Section 12.00ff of Appendix 1, Subpart P, Regulations No. 4,[8] consideration must first be given to the diagnostic characteristics of the impairment, and then consideration is given to the resulting functional limitations.  Objective findings would not lead to a conclusion that the claimant's dysthymic disorder is severe.  Since there are objective findings to support some of his subjective complaints it may be found that his impairments in combination are severe.  However, objective findings would not support a conclusion that

---

[7] An impairment(s) is medically equivalent to a listed impairment "if the medical findings are at least equal in severity and duration to the listed findings.  We will compare the symptoms, signs, and laboratory findings about your impairment(s) . . . with the medical criteria shown with the listed impairment."  20 C.F.R. § 404.1526(a) (2005).

[8] The Court surmises that there is a typographical error in the ALJ's citation; it is presumed that the ALJ is referring to Listing 12.04.

> any of the claimant's impairments, considered singly or in
> combination, are of the degree of severity of any listed impairment
> in Appendix 1 to Subpart P of the Regulations.

(T. at 17-18.)  Pursuant to the second step of the five step process, although the ALJ did not find

Plaintiff's dysthymic disorder to be severe, step two was nonetheless satisfied because he found

that Plaintiff's combination of impairments were severe, which brings us to the issue of whether

Plaintiff's dysthymic disorder met or equaled Listing 12.04.[9]

In order to meet the requirements of Listing 12.04, "[t]he required level of severity for

these disorders is met when the requirements in both A and B are satisfied, or when the

requirements in C are satisfied":

    A.    Medically documented persistence, either continuous or intermittent, of one of the following:
        1.    Depressive syndrome characterized by at least four of the following:
                a.    Anhedonia or pervasive loss of interest in almost all activities; or
                b.    Appetite disturbance with change in weight; or
                c.    Sleep disturbance; or
                d.    Psychomotor agitation or retardation; or
                e.    Decreased energy; or
                f.    Feelings of guilt or worthlessness; or
                g.    Difficulty concentrating or thinking; or
                h.    Thoughts of suicide; or
                i.    Hallucinations, delusions, or paranoid thinking; or
        2.    Manic syndrome characterized by at least three of the following:
                a.    Hyperactivity; or
                b.    Pressure of speech; or
                c.    Flight of ideas; or
                d.    Inflated self-esteem; or
                e.    Decreased need for sleep; or
                f.    Easy distractability; or

---

[9]  In his brief the Plaintiff refers to Listing 12.04 but focuses on the severity of his depression. Given the ALJ's finding that Plaintiff's combination of impairments was severe, the focus should be on whether these combined impairments meet or equal a listed impairment.

g.      Involvement in activities that have a high probability of painful consequences which are not recognized; or

h.      hallucinations, delusions, or paranoid thinking;

or

3.      Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B.      Resulting in at least two of the following:

    1.      Marked restriction of activities of daily living; or

    2.      Marked difficulties in maintaining social functioning; or

    3.      Marked difficulties in maintaining concentration, persistence, or pace; or

    4.      Repeated episodes of decompensation, each of extended duration;

OR

C.      Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

    1.      Repeated episodes of decompensation, each of extended duration; or

    2.      A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

    3.      Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 (2005).

Plaintiff argues that medical evidence documents his "reports of pervasive loss of interest in nearly all daily activities, his sleep disturbances, decreased energy and fatigue, and difficulty concentrating" (Dkt. No. 19 at 12), which are four of the requirements set forth in A.1. However, as stated above, in order to meet the requirements of Listing 12.04, one must satisfy the requirements in both A and B, or C.

### 1.   Medical Evidence

Plaintiff was examined by Anna Engel, M.D. on November 28, 1997.  (T. at 213-214.)

He was taking Amitryptiline[10] and claimed that his symptoms included dysphoria,[11] tears,

irritability, decrease in interest, occasional suicidal ideation, guilt, and withdrawal since his car

accident, which happened four years prior.  (T. at 213.)  Regarding Plaintiff's mental status, Dr.

Engel wrote that Plaintiff was not suicidal, had no hallucinations or paranoid ideation, and was

not delusional.  Dr. Engel's impression was "major depression – **single episode** – moderate."  (T.

at 214, emphasis added.)  Since Plaintiff complained that the Amitriptyline gave him a "marked

hangover," Dr. Engel said she would try Bupropion,[12] Nafazadone,[13] or Trazodone.[14]  (T. at 213-

214.)

On December 8, 1997, Dr. Engel prescribed Wellbutrin and diagnosed Plaintiff as

follows: Axis I, major depression – single episode – moderate; Axis II, chronic pain; Axis IV,

litigation pending, and Axis V, GAF – 51.[15]  (T. at 211.)

---

[10]  Amitriptyline hydrochloride is the generic name for Elavil, which is prescribed for the relief of symptoms of mental depression.  *The PDR Pocket Guide to Prescription Drugs* 441 (3d ed. 1998).

[11]  Dysphoria is defined as "disquiet, restlessness, malaise."  *Dorland's Illustrated Medical Dictionary* 577 (30th ed. 2003).

[12]  Bupropion hydrochloride is the generic name for Wellbutrin, which is an antidepressant medication given to help relieve certain kinds of major depression.  *The PDR Pocket Guide to Prescription Drugs* 1361 (3d ed. 1998).

[13]  Nefazodone hydrochloride is the generic name for Serzone, which is prescribed for the treatment of depression severe enough to interfere with daily functioning.  *The PDR Pocket Guide to Prescription Drugs* 1133 (3d ed. 1998).

[14]  Trazodone hydrochloride is the generic name for Desyrel, which is prescribed for the treatment of depression.  *The PDR Pocket Guide to Prescription Drugs* 355 (3d ed. 1998).

[15]  "The DSM-IV multiaxial scale assesses an individual's mental and physical condition on five axes, each of which addresses distinct areas.  Axis I refers to clinical disorders; Axis II refers to

Dr. Engel saw Plaintiff for a follow up visit on December 31, 1997.  (T. at 209-210.)

Plaintiff reported that he felt better; specifically that his mood was a little better, he was less

irritable, had fewer tears, his symptoms of withdrawal had decreased, and his sleep had

improved.  (T. at 209.)  Dr. Engel's impression was "Major depression – single episode – partial

remission."  (*Id.*)  Plaintiff was to continue taking Wellbutrin.  (*Id.*)

On February 2, 1998, Plaintiff saw Dr. Engel for another follow up appointment.  (T. at

207-208.)  Plaintiff reported that overall, he felt better, and was taking Wellbutrin.  (T. at 207.)

Plaintiff reported that his sleep was satisfactory, except for occasional problems getting to sleep,

which he stated occurred once every other week.  (*Id.*)  Plaintiff also stated that his irritability had

decreased and that he had a slight increase in interest; for example, Dr. Engel noted that Plaintiff

had not yet returned to building models, but was thinking about it.  (*Id.*)  Dr. Engel's impression

was "Major depression – single – partial remission."  (T. at 208.)  She told Plaintiff to continue

taking Wellbutrin.  (*Id.*)

On August 2, 1999, Plaintiff was examined by Sumner H. Goodman, Chief of Psychiatry

Service.  (T. at 140.)  Plaintiff was taking Welbutrin "on which he is doing much better."  (*Id.*)

Dr. Goodman noted no suicidal or homicidal ideation, delusions, or hallucinations.  (*Id.*)

Plaintiff was mildly euthymic,[16] and otherwise alert, fully oriented, and had a stream of thought

---

developmental and personality disorders; Axis III refers to general medical conditions; Axis IV refers to
psychosocial and environmental problems and Axis V describes the individual's global assessment of
functioning ("GAF").  *Diagnostic and Statistical Manual of Mental Disorders* 27 (4th ed. text rev. 2000).
A GAF of 60 reflects the highest range of functioning within moderate symptoms of deficiencies in
social, occupational, or school functioning."  *Niven v. Barnhart*, 03 Civ. 9359, 2004 WL 1933614, at * 1
n.4 (S.D.N.Y. Sept. 1, 2004).

[16] Euthymia is "a state of mental tranquility and well-being; neither depressed nor manic."
*Dorland's Illustrated Medical Dictionary* 650 (30th ed. 2003).

that was logical and coherent.  (*Id.*)  Dr. Goodman's impression was dysthymic[17] disorder by

history and told Plaintiff to continue taking Welbutrin.  (*Id.*)

At various therapy sessions with Michael Alexandrov, M.D. from August 17, 1999

through August 8, 2000, Plaintiff was diagnosed with dysthymic or depressive disorder and was

told to continue taking Welbutrin.  (T. at 141-158.)  At Plaintiff's September 3, 1999 visit, he told

Dr. Alexandrov that in addition to his teenage daughter, his five year old son, who had been

diagnosed with attention deficit disorder, had been living with him for the past two weeks and he

was learning "coping skills" in order to deal with his new parental responsibilities.  (T. at 141.)

Plaintiff stated his mood was "good" but he had some decrease in energy.  (*Id.*)  At a September

17, 1999 session, Plaintiff described "everything that he had to do for his children" and reported

that he was too busy to have done anything regarding his own "disability and vocational

problem."  (T. at 142.)  Plaintiff reported "good sleep and mood."  (*Id.*)  On October 22, 1999,

Dr. Alexandrov remarked that Plaintiff had a fair mood and was "slowly striding forward re his

financial and parental responsibilities."  (T. at 142-143.)  On December 21, 1999, Plaintiff

reported increased "dysphoria, irritability, amotivation [sic]."  (T. at 146.)  At a follow up

appointment on January 4, 2000, Plaintiff reported a fair mood and Dr. Alexandrov observed that

Plaintiff was doing well on his current medication.  (*Id.*)  At a July 25, 2000 appointment,

Plaintiff complained of insomnia, difficulty falling asleep, and frequent awakenings.  (T. at 157.)

He also reported a fair mood and continued frustration.  (*Id.*)

---

[17]  Dysthymic is defined as depression.  *Dorland's Illustrated Medical Dictionary* 579 (30th ed.
2003).

2.        **Analysis**

Plaintiff seemingly argues that he satisfies requirement A of Listing 12.04 by having a depressive syndrome characterized by (1) loss of interest, (2) sleep disturbance, (3) decreased energy, and (4) difficulty concentrating or thinking.  (Dkt. No. 19 at 12.)  As stated above, in order to meet Listing 12.04, a claimant needs to satisfy the requirements of B, in addition to A. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.  In his brief, Plaintiff does not specifically state what his depressive syndrome results in which would address the requirements of B. Specifically, Plaintiff fails to articulate whether his depressive syndrome results in a marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decomposition, each of extended duration.  *Id.*[18]

In addition, the medical evidence does not support the argument, if Plaintiff had made it, that his depressive syndrome resulted in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decomposition, each of extended duration.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. Neither Dr. Engel nor Dr. Alexandrov noted any marked restrictions of Plaintiff's daily living, maintaining social functioning, maintaining concentration, persistence, or pace, or any repeated episodes of decomposition.  In fact, Drs. Engel and Alexandrov noted that upon taking Wellbutrin, Plaintiff was doing better and often reported a fair mood and improved sleeping.

---

[18]  As stated above, *supra* at page four, the Plaintiff bears the burden of showing that he meets or equals a listed impairment.  20 C.F.R. § 404.1520(a)(4)(iii) (2005).

15

While Plaintiff did complain of insomnia on July 25, 2000 (T. at 157), Dr. Alexandrov did not note that this resulted in any restrictions or difficulties.

Accordingly, there is substantial evidence to support the ALJ's finding that Plaintiff's dysthymic disorder was not of the degree of severity of any listed impairment.

### C.    Whether the ALJ Failed To Meet His Burden of Fully and Fairly Developing the Record with Regard to All of the Plaintiff's Exertional and Non-Exertional Impairments

Plaintiff contends that despite the evidence regarding Plaintiff's exertional and non-exertional impairments "there is <u>no</u> statement in the record from any treating source regarding plaintiff's disability status or the limitations imposed by any these [sic] impairments." (Dkt. No. 19 at 13.) Plaintiff further argues that the ALJ failed to develop the record by not requesting "a treating source opinion regarding plaintiff's ability to perform his past relevant work or any substantial gainful activity on a sustained basis with [his] considerable physical and mental conditions." (Dkt. No. 19 at 14.)

"It is the rule in [the Second C]ircuit that 'the ALJ, unlike a judge in a trial, must . . . affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding,' even if the claimant is represented by counsel." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) and *Echevarria v. Secretary of Health and Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)). "[T]he record must be sufficiently complete to 'make a determination . . . about whether [plaintiff is] disabled . . .'" *Youney v. Barnhart*, 280 F. Supp. 2d 52, 62 (W.D.N.Y. 2003) (quoting 20 C.F.R. § 404.1512(e)). The ALJ has the duty to develop the record and seek out further information where physicians' reports are inconsistent and where gaps exist in the record. *Peterson v. Barnhart*, 219 F. Supp.

2d 491, 494-95 (S.D.N.Y. 2002) (citing *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999)).

However, where the ALJ has a "complete medical history, the ALJ is under no duty to seek

additional information before rejecting a claim." *Peterson*, 219 F. Supp. 2d at 495 (citing *Rosa*,

168 F.3d at 79 n.5 (other citations omitted)); *see also Youney*, 280 F. Supp. 2d at 62 (the

Commissioner "need not develop the record in areas where there is absolutely no credible

evidence, medical or otherwise, that such development is necessary") (citing *Schaal v. Apfel*, 134

F.3d 496, 505 (2d Cir. 1998) ); and *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996) ("The ALJ had

before him a complete medical history, and the evidence received from the treating physicians

was adequate for him to make a determination as to disability.").[19]

### 1.    Plaintiff's Non-Exertional Impairments

With regard to Plaintiff's depression, further development of the record was not

necessary.  As described above in Section V.B.1., there is substantial evidence (that includes the

opinions of treating physicians Drs. Engel and Alexandrov) to support the ALJ's finding that

---

[19]   It is ironic that Plaintiff now laments the ALJ's failure to develop the record with treating source opinions since the ALJ specifically held the record open, at Plaintiff's request, to allow him to submit such material.

| | |
|---|---|
| ALJ: | You've given me some additional things here.  What do we got? |
| Atty: | What we got is just for [sic] some older medical reports from a treating orthopedic, Dr. Carl, from pain management, Dr. Smith, a couple of reports from a Worker's Compensation Consulting doctor, and then a bunch of medical that you didn't have from the VA.  What we don't have is more recent medicals from the VA, and my client tells me that his treating psychiatrist has indicated that she – he? |
| Clmt: | She. |
| Atty: | She would be willing to provide a statement of reference to his – |
| ALJ: | You want some time? |
| Atty: | Well, for that I'd like some time. |

(T. at 49.)  In other words, the ALJ honored Plaintiff's request to submit, *inter alia*, a statement from his treating psychiatrist at the VA Hospital.  Plaintiff failed to do so, yet he now complains that the ALJ is to blame.  Chutzpah comes to mind.

Plaintiff's depression was not severe and that it did not meet or equal Listing 12.04.  That substantial evidence, namely that Plaintiff felt better upon being prescribed Wellbutrin and that his depression was characterized as a "single episode" and in partial remission (T. at 140, 207-209), was not inconsistent with other medical evidence, nor were there gaps in the record.  Furthermore, Plaintiff has not pointed out any specific inconsistencies or gaps in the medical evidence that would warrant further development of the record.  Thus, there is "little indication in the record suggesting a disabling mental disorder . . . that would have obligated the ALJ to develop the record further."  *Schaal*, 134 F.3d at 505.

The same reasoning would hold true for Plaintiff's sleep apnea, which Plaintiff also claims as a non-exertional impairment.[20]  (Dkt. No. 19 at 13.)  Although Plaintiff had been diagnosed with severe obstructive sleep apnea syndrome (T. at 133, 136), he was treated with a CPAP machine, which improved his breathing, and Plaintiff had "excellent" benefit from the treatment (T. at 138, 152, 480).  Thus with respect to sleep apnea there are not any inconsistencies or gaps in the medical evidence (and Plaintiff obviously has not pointed to any) that would warrant further development of the record.  *Schaal*, 134 F.3d at 505.

With regard to Plaintiff's migraine headaches, it is unclear whether further development of the record by the ALJ was necessary because, as stated above in Section V.A., the ALJ's decision did not make any specific finding in this regard.  For this reason, upon remand, whether the record needs further development or not will depend on what the ALJ finds.  For example, the ALJ may or may not find that there is sufficient evidence contained in the record to determine whether Plaintiff is or is not disabled by, *inter alia*, his migraine headaches.  If the ALJ finds

---

[20]  Defendant's brief does not specifically address Plaintiff's sleep apnea.  (Dkt. No. 20 at 9-11.)

sufficient evidence to support Plaintiff's claim of disabling migraine headaches, further

development of the record may be necessary to determine what Plaintiff can do despite his

migraine headaches.  Thus, upon remand, if the ALJ finds it necessary to develop the record

further with regard to Plaintiff's migraine headaches, this Court assumes that such development

will occur.

### 2.    Plaintiff's Exertional Impairments

The ALJ found that "[t]he claimant has the residual functional capacity to perform the

work-related functions except for work involving lifting over 50 pounds or heavy manual labor."

(T. at 19.)  In other words, the ALJ found that Plaintiff was capable of performing sedentary,[21]

light,[22] and medium[23] work.  In his argument for further development of the record, Plaintiff

contends that the ALJ:

> should have requested a treating source opinion regarding
> plaintiff's ability to perform his past relevant work or any
> substantial gainful activity on a sustained basis with [his]
> considerable physical and mental conditions.  Without such
> evidence, there is no basis in the record to support the ALJ's
> finding that the plaintiff retained the residual functional capacity to

---

[21]   "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a) (2005).

[22]   "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."  20 C.F.R. § 404.1567(b) (2005).

[23]   "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20 C.F.R. § 404.1567(c) (2005).

19

> perform his past relevant work and/or all work except heavy
> manual labor.

(Dkt. No. 19 at 14.)  Defendant argues that the ALJ clearly met his obligation to develop

Plaintiff's complete medical history under 20 C.F.R. § 404.1512(d).[24]  (Dkt. No. 20 at 9.)

While Plaintiff did not cite to any caselaw to support his argument, some Courts have

addressed the issue.  In *Rosa v. Apfel*, the Court remanded for further development of the record

regarding Rosa's back pain and accompanying functional limitations.  *Rosa v. Apfel*, Civ. No. 97-

5831, 1998 WL 437172 at *4 (S.D.N.Y. July 31, 1998).  Specifically, although the record

contained medical evidence from Rosa's treating physician, "notably absent . . . [was] a

discussion of plaintiff's residual physical capabilities."  *Id.* at *2.  The Court found that the ALJ

failed to develop the record because:

> A simple follow-up request from the ALJ could have resulted in an
> assessment of the claimant's residual functional capacity from his
> treating physician.  If asked, Dr. Pajela might have been able to
> offer clinical findings to the effect that the claimant was or was not
> able to work because of his impairments.  Dr. Pajela's failure to
> include his assessment of the claimant's ability to work does not
> mean that such information does not exist; "he might not have
> provided this information in the report because he did not know
> that the ALJ would consider it crucial to the disposition of the
> case."

*Id.* at *4 (quoting *Clark v. Commissioner of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998)).

In addition, in *Peed v. Sullivan*, the Court held that

---

[24]  Defendant further argues, in response to Plaintiff's contention that the ALJ should have
obtained a statement from Plaintiff's treating providers at the VA Hospital, that at the request of
Plaintiff's attorney, the ALJ held the record open to allow for the submission of updated medical
information, including a medical source statement.  (Dkt. No. 20 at 10.)  However, Plaintiff's attorney
specified that this medical source statement was to be from his treating psychiatrist, not a physician who
would opine about Plaintiff's exertional impairments.

> [I]t is not sufficient for the ALJ to simply secure raw data from the
> treating physician.  What is valuable about the perspective of the
> treating physician . . . is his opportunity to develop an informed
> *opinion* as to the physical status of a patient.  To obtain from a
> treating physician nothing more than charts and laboratory test
> results is to undermine the distinctive quality of the treating
> physician that makes his evidence so much more reliable than that
> of an examining physician who sees the claimant once and who
> performs the same tests and studies as the treating physician.  It is
> the *opinion* of the treating physician that is to be sought; it is his
> *opinion* as to the existence and severity of a disability that is to be
> given deference.

*Peed v. Sullivan*, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991) (emphasis in original).

These cases, however, are not on all fours with the instant matter.  In *Rosa* and *Peed*, the

plaintiffs appeared *pro se*; here, Plaintiff is represented by counsel.  In cases where claimants

appear *pro se*, "the ALJ is under a heightened duty to scrupulously and conscientiously probe

into, inquire of, and explore for all the relevant facts."  *Echevarria*, 685 F.2d at 755 (citations and

internal quotation marks omitted).  *See also Peed*, 778 F. Supp. at 1246 ("Thus, when the

claimant appears pro se, the combined forced of the treating physician rule and of the duty to

conduct a searching review requires that the ALJ make every reasonable effort to obtain not

merely the medical records of the treating physician but also a report that sets forth the opinion of

the treating physician as to the existence, the nature, and the severity of the claimed disability.")

Plaintiff's alleged exertional impairments include pain in his neck and back.  Plaintiff was

treated by various physicians at the VA Hospital.  (*See, e.g.*, T. at 121 (Plaintiff treated by David

L. Chalnick, orthoresident); T. at 122 (Plaintiff treated by Louis J. Benton; there is no title

listed); T. at 122 (Plaintiff treated by Franklin Glockner, attending surgeon); T. at 122-123 (notes

dictated by Dr. Wise, but signed by Franklin Glockner, attending surgeon)).  Additionally, there

are some medical records where it is impossible to determine who was the physician treating

Plaintiff and/or the facility or provider where Plaintiff received care.  (*See*, *e.g.*, T. at 186 (record

contains no physician's signature, nor does it include any information about the facility where

Plaintiff was treated); T. at 216 (Plaintiff was treated at the VA Hospital by a physician whose

signature is illegible; T. at 223 (Plaintiff was seen for an orthopedic consultation, but the

physician's signature is illegible and there is no identifying information about the facility)).  Most

of this medical evidence consists of "'raw data' – laboratory reports, test results, and brief

notations by various physicians."  *Peed*, 778 F. Supp. at 1243.  In addition, Plaintiff was treated

by PM&R Physical Therapy (*see*, *e.g.*, T. at 202, 237, 246-249); at the Albany Medical College

(T. at 383-385); and at the Pain Management Center at Albany Medical College (*see*, *e.g.*, 394,

392).  The Court is unsure as to whether or not Plaintiff had a treating physician(s) at any of these

facilities.

The lack of a medical source statement as to what a claimant can do despite his/her

impairment(s) does not render a report incomplete (20 C.F.R. § 404.1513(b)(6)).  However, the

absence of a residual functional capacity assessment makes it "difficult to see how the ALJ could

conclude that plaintiff 'has the residual functional capacity to perform light work.'"  *Blake v.*

*Bowen*, Civ. No. 86-3091, 1988 WL 16183, at *1 (E.D.N.Y. Feb. 19, 1998).

Under the circumstances, and since Plaintiff was represented by counsel, the Court

believes that the ALJ did not need to develop the record further.  Although there is medical

evidence to support Plaintiff's complaints of back and neck pain, MRIs of his cervical spine

showed no evidence of disc herniation (T. at 355, 356), and there was no evidence of C6

radiculopathy (T. at 389) or thoracic outlet syndrome (T. at 386).  Nevertheless, because the

22

Court is recommending remand as set forth above in Section V.A., and below in Section V.D., to the extent that Plaintiff had a treating physician(s) at the VA Hospital, the opinion of the treating physician(s), *e.g.*, in the form of a residual functional capacity assessment, should be sought.

        **D.**      **Whether the ALJ Failed to Properly Evaluate Plaintiff's Credibility with Regard to His Complaints of Subjective Pain and Disabling Symptoms**

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, Civ. No. 96-9435, 1999 WL 185253, at *5 (S.D.N.Y. Mar. 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record.  20 C.F.R. § 404.1529 (2005); *see also Foster v. Callahan*, Civ. No. 96-1858, 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).  First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ."  20 C.F.R. § 404.1529(a) (2005).  Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work.  20 C.F.R. § 404.1529(c) (2005).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related

23

factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.  20 C.F.R. § 404.1529(c)(3) (2005).  An ALJ's evaluation of a plaintiff's credibility is entitled to great deference if it is supported by substantial evidence.  *Murphy v. Barnhart*, Civ. No. 00-9621, 2003 U.S. Dist. LEXIS 6988, at *29-*30 (S.D.N.Y. Jan. 21, 2003) (citing *Bischof v. Apfel*, 65 F. Supp. 2d 140, 147 (E.D.N.Y. 1999) and *Bomeisl v. Apfel*, Civ. No. 96-9718, 1998 U.S. Dist. LEXIS 11595, at *19 (S.D.N.Y. July 30, 1998) ("Furthermore, the ALJ has discretion to evaluate a claimant's credibility . . . and such findings are entitled to deference because the ALJ had the opportunity to observe the claimant's testimony and demeanor at the hearing.")).

In this case, the ALJ stated that Plaintiff's "subjective complaints are considered grossly overstated and not credible . . . ."  (T. at 19.)  In coming to this conclusion, the ALJ did not explicitly discuss whether, based upon the objective medical evidence, Plaintiff's impairments could not reasonably be expected to produce the pain or other symptoms alleged.  As such, the first step of the two-step analysis of the evidence in the record, required by 20 C.F.R. § 404.1529, was not met.  In addition, the ALJ did not set forth his reasons for rejecting Plaintiff's subjective complaints with "sufficient specificity" so that this Court could decide whether the determination is supported by substantial evidence.  *Lewis*, 62 F. Supp. 2d at 651 (quoting *Gallardo*, 1999 WL 185253, at *5).

If the Court were to assume that the ALJ found, from the objective medical evidence, that

Plaintiff's impairments **could not** reasonably be expected to produce the pain or other symptoms alleged,[25] the ALJ would then have had to assess the credibility of Plaintiff's subjective complaints by considering the record in light of the various symptom-related factors including, *inter alia*, Plaintiff's daily activities; the location, duration, frequency, and intensity of the symptoms; and the type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms.  20 C.F.R. § 404.1529(c)(3).  The ALJ's decision contains no such discussion, so even if this Court were to assume that the ALJ met the first step, the second step was clearly not met and remand for the proper evaluation of Plaintiff's complaints of pain is recommended.

**WHEREFORE,** it is hereby

**RECOMMENDED**, that this matter be remanded to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g),[26] for further proceedings consistent with the above.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed.

---

[25]   The language of the ALJ's decision could lend itself to this conclusion.  For example, the ALJ stated Plaintiff "was involved in a motor vehicle accident in 1993, but recent diagnostic studies have demonstrated only relatively mild degenerative changes and there has been no frank evidence of disc herniation or neurological abnormalities." (T. at 18.)  The ALJ also noted that "[a]lthough he underwent carpal tunnel surgery in June 1999, a review of his medical record does not support a conclusion that he had any significant limitations with the use of his hands prior to that time." (*Id.*)

[26]   Sentence four reads "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g) (2005).

R. Civ. P. 72, 6(a), 6(e).

Dated: March 21, 2006
      Syracuse, New York

                                       George H. Lowe
                                       United States Magistrate Judge